UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


STAFFORD EMS, INC.,

          Plaintiff

v.                                Civil Action No.: 2:02-0886

J.B. HUNT TRANSPORT, INC.,
a Georgia corporation,

          Defendant


<u>MEMORANDUM OPINION AND ORDER</u>


          The defendant J.B. Hunt Transport, Inc., filed its
motion for partial summary judgment on April 7, 2004, seeking as
a matter of law to exclude the plaintiff Stafford EMS, Inc.,
from claiming lost profits as a component of its claimed damages
in this negligence action.

          On the morning of trial, November 16, 2004, the court
granted the motion on the record except to the extent of "29
lost runs" for the period from December 12, 2001, to April 4,
2002, about which the plaintiff's principal testified.  The
court's ruling was based on the pleadings, depositions, answers
to interrogatories, admissions and affidavits then on file that

showed there was no other genuine issue of material fact.  The
rationale for the court's ruling follows.

I.

A.   The Collision.

On the evening of September 24, 2001, a tractor-
trailer owned by the defendant and operated by its employee,
Gerry Carlisle, was en route from Manchester, Kentucky, to
Wytheville, Virginia.  At approximately 8:15 p.m. on U.S. Route
52, while traversing an S-shaped curve on Horse Pen Mountain,
Carlisle's trailer crossed the center line, striking and
damaging an ambulance operated by plaintiff.

B.   Unit 37.

The ambulance involved in that collision, Unit 37, was
one of eight ambulances that the plaintiff had in operation as
of September 24, 2001, from its base in Gilbert, West Virginia.
The ambulances operated by plaintiff were of two types: Advance
life support ("ALS") and Basic life support ("BLS").  An ALS
unit contains a heart monitor, drugs, and other paramedic

2

equipment not normally contained in a BLS unit.  Dep. Simpson at
p. 42.  ALS units are typically reserved for emergency calls
while BLS units handle regularly scheduled transports.  Dep.
Smyth (12/11/03) at p. 10; Dep. Smyth (01/07/04) at p. 18.  Unit
37 was an ALS unit.

　　　　Plaintiff's director, Kendell Simpson, testified that,
at the time of the collision, the plaintiff's fleet of eight
ambulances consisted of four ALS units and four BLS units.  Dep.
Simpson at p. 44.  Although the ALS units are higher profile
inasmuch as they respond to visible events such as accidents,
the bulk of an ambulance service's revenues are generated
through regular transports conducted by BLS units.  Smyth
(12/11/03) at p. 10.

　　　　Simpson stated that Unit 37 was purchased by the Mingo
County Commission.  Id. at p. 4.  The plaintiff is a separate
entity from the Commission.  Id.  Simpson testified that the
plaintiff entered into an agreement with the Commission whereby
the Commission agreed to subsidize an ambulance service "to
cover the citizens of Mingo County."  Id.  Although Unit 37 was
purchased by the Commission, the plaintiff owns the life saving
equipment in it, including the heart monitor and pulse oximeter.

3

The plaintiff maintains an insurance policy on the ambulance and
the equipment through National Union Fire Insurance Company.
Plaintiff is responsible for making claims under that policy.
Plaintiff does not share profits generated by the unit with the
Commission.  Id. at p. 6.

        C.   <u>Physical Damage to Unit 37.</u>

       As a result of the accident on September 24, 2001,
Simpson testified to the following damage to the vehicle:

> The left front portion of the ambulance, grill,
> fender, left side door, mirror assembly, wheel and
> tire, steering, steering box, linkage, left running
> board, damage to the paint on the left side of the
> vehicle as the box trailer scrubbed along the side of
> the vehicle, damage to the rear bumper damage to the
> rear wheel and wheel cover, damage to the right front
> steering linkage, right side door, passenger door,
> running board, the diamond plate for the running board
> and the rub rail on the right side, mirror assembly
> right side.  Actually both sides of the ambulance,
> hood, and along those areas and all down the left side
> of the ambulance was damaged.

Id. at 9.  The axle was not damaged.  Id.

       In addition to the damage to the vehicle, Unit 37's
MRL heart monitor and pulse oximeter were damaged beyond repair.
Id. at pp. 20-22.  Simpson testified, on January 3, 2003, that

4

it was necessary to purchase a new heart monitor, the cost of which is not stated.[1]  Id.  The pulse oximeter was replaced at a cost of $433.  Id.  In his affidavit given October 21, 2004, and filed October 27, 2004, Simpson says that a heart monitor costs $10,000 to $12,000 to replace.  Presumably, that loss was covered by the National Union Fire Policy.

Subsequent to the collision, the plaintiff's maintenance man and Simpson towed the ambulance to plaintiff's base in Gilbert.  Id. at pp. 27-28.  Pursuant to instructions from Tom Robertson of Custard Insurance Agency who was engaged by the self-insured defendant to investigate the accident, the plaintiff, allegedly at Robertson's direction, sent Unit 37 to Ash County Motors Body Shop in West Jefferson, North Carolina, purportedly for repairs.  Id. at pp. 9-10.  Ash County Motors Body Shop provided an estimate but was not authorized to undertake the repairs.  Id. at pp. 9-12.  Additionally, plaintiff, again purportedly with Robertson's authorization,

---

[1]The plaintiff received a $1,770 invoice from R-Wave Medical in West Palm Beach, Florida pertaining to medical equipment. Simpson's testimony is ambiguous as to whether this invoice pertains solely to the heart monitor or to both the heart monitor and pulse oximeter.  Id. at pp. 20-22.  It appears that R-Wave was paid $745 by the plaintiff.

obtained a rental unit at a rate of $200 per day from Northwestern Emergency Vehicles which is also located in North Carolina.  Id. at pp. 13-14.  Simpson testified that the rental unit was an ALS.  Id. at p. 44.

The rental unit was obtained approximately seven days after the collision and remained rented until December 12, 2001, when plaintiff was informed by defendant that defendant would not be paying the rental charges.  Id. at pp. 15-16.  The rental charges accrued by plaintiff were $13,800.  Id. at p. 14. Towing charges of $260 were also incurred.  Id. at p. 18.

Subsequent to defendant's refusal to pay the rental charges, plaintiff retrieved Unit 37 from Ash County Motors Body Shop and, although that body shop did not perform repairs on Unit 37, plaintiff was invoiced $375 for storage.  Id. at 37. Thereafter, plaintiff's in-house repairman made several repairs to Unit 37.  Cline Automotive also made $1,697.54 of repairs and Unit 37 was re-painted by Poor Man Body Shop for $500.00.  Unit 37 was operational by April 4, 2002.  Id. at p. 15.  From the return of the rental unit in December to April 4, 2002, the plaintiff was short one ambulance.

6

Simpson testified that between December 12, 2001, and March 29, 2002, plaintiff refused 29 calls, which he presumed to be emergency calls, because Unit 37 was down.  Id. at pp. 43-44.  Plaintiff claims its lost profits from these 29 calls.

II.

A.   Lost Profits Alleged in the Gilbert and Williamson Markets.

In addition to the loss of the 29 refused calls, plaintiff seeks the profits it contends were lost due to the intrusion of a competitor, Stat Ambulance Service, who entered the Gilbert market upon learning of the loss of Unit 37.  The history of Stat's intrusion into the Gilbert market and later into the Williamson market is related by a former competitor of the plaintiff.[2]

In 1997, Anthony Blevins, a paramedic and EMT who lived near Gilbert, started an ambulance service called Southern

---

[2]The Gilbert market is the plaintiff's traditional market in eastern Mingo County.  The Williamson market refers to areas in the western portion of Mingo County which were opened by the failure in August 2002 of another ambulance service, Critical Link, serving that market.  Horse Pen Mountain serves somewhat as a natural divide between the two markets.

7

West Virginia EMS which conducted business in Mingo, Logan and McDowell counties.  Dep. Blevins at pp. 5-6.  Blevins opened an office in Gilbert but most of his Mingo County business was in the Williamson area because of the plaintiff's strong presence in Gilbert.  Id.  Blevins' business, however, ran into financial problems and it filed for bankruptcy in the Fall of 2000.  Id. at p. 49.

At some point either prior to filing for bankruptcy or during the bankruptcy proceedings, Blevins was approached by Jason Smyth, the owner of Community Response Ambulance Service, which operated in Wyoming County, about purchasing Blevins' business.  Id. at pp. 16-17.  Blevins testified that when he was approached about selling his business it was "in Chapter 11" and the judge would not approve a sale.  Id.  Nevertheless, Smyth remained interested in entering the Mingo County market.  Id. at 17; Dep. Smyth (01/07/04) at pp. 5-6.

Apparently shortly after the September 24, 2001, collision, Blevins learned that Unit 37 was down in need of repairs and that the loss of the unit was affecting plaintiff's response time.  Dep. Blevins at pp. 17-19.  Blevins contacted

8

Smyth and notified him that the time was right to enter the Gilbert market.  Id. at pp. 20-21.

Smyth testified that he took the idea of entering the Gilbert market to Rosie Sims, the owner of Stat, a company about to be launched.[3]  Dep. Smyth (01/07/04) at pp. 10-11.  Blevins indicated that Stat was just being formed because its affiliate company, Community Response, was not licensed for ALS.  Dep. Blevins at p. 25.  Smyth contacted Shane Wriston in August 2001 and asked if Wriston was interested in opening an ambulance service in Mingo County for Sims.  Dep. Wriston at p. 5.  Wriston followed up by contacting Sims.  Id.  In November 2001, Sims hired Wriston for the purpose of directing Stat's start-up in Gilbert.  Id.  Wriston and one other employee set up shop in Gilbert and began advertising aggressively in the surrounding communities about Stat.  Id. at pp. 5-7.  Blevins indicates that

---

[3]Blevins testified that Rosie Sims is a figurehead. According to Blevins, the force behind both Community Response and Stat is Bill Buzzo, Smyth's grandfather.  Dep. Blevins at pp. 25-27.  Blevins contends that Smyth ran both Community Response and Stat.  Id.  He states that Shane Wriston was brought in as the initial director of Stat to assist in the licensing process.  Smyth testified that Sims purchased Community Response and that he replaced Wriston as the director of Stat's operations.  Dep. Smyth (12/11/03) at pp. 3-4 & 19-20.

this "advertising" included informing prospective clients that plaintiff's business had for reasons unknown not repaired or replaced Unit 37.  Dep. Blevins at pp. 21-24.

Although Stat began canvassing the community and maintaining a presence in Gilbert as early as November 1, 2001, Stat was not licensed until June 2002 and did not make any runs until then.  Dep. Smyth (01/07/4) at p. 29; Dep. Wriston at pp. 7-8.  Wriston testified that although Stat was not handling runs, customers calling Stat would be referred to Community Response's office in Pineville, Wyoming County, which in turn provided service.  Dep. Wriston at pp. 7-8.  Wriston indicated that Community Response serviced calls in Hanover which is in Wyoming County and Justice which is in Mingo County, but not in Gilbert.  Dep. Wriston at pp. 7-8.  However, Smyth, who owned Community Response, testified that Community Response only ran Wyoming County calls.  Dep. Smyth at pp. 28.  Wriston further testified that Stat did not take in income until August of 2002. Id. at p. 15.  Blevins, Smyth and Wriston all stated that the loss of Unit 37 was the catalyst for Stat entering the Gilbert market.  Dep. Smyth (01/07/04) at p. 23; Dep. Blevins at p. 45; Dep. Wriston at pp. 10-11.

10

In August of 2002, Critical Link, an ambulance service in Williamson, West Virginia, ceased its operations.  Dep. Wriston at pp. 11-12.  It appears that the plaintiff was contacted by the Mingo County Commission to replace Critical Link and that the plaintiff made plans to assume Critical Link's clientele.  Blevins learned of this and contacted Stat.  Dep. Blevins at p. 8; Dep. Wriston at pp. 12.  Thereafter, Stat sought to compete with plaintiff in the Williamson market.

A bidding war for employees in the Williamson market ensued between plaintiff and Stat and the plaintiff was initially successful in retaining Critical Link's former employees.  Dep. Blevins at pp. 33-34.  However, in February 2003, while Simpson was out of town, a manager for the plaintiff terminated a "non essential" employee and 15 to 17 of plaintiff's other employees in the Williamson market utilized that firing to seek opportunities with Stat, reducing plaintiff's ability to compete in the Williamson market.  Dep. Smyth (01/07/04) at p. 46.  As the result of mounting losses in the Williamson market, the plaintiff, in exchange for $35,000 received from Stat, entered into a non-compete agreement with Stat dated December 30, 2003, in which Stat agreed not to

11

compete in plaintiff's traditional Gilbert market and plaintiff
agreed not to compete in the Williamson market.  Id. at pp.
49-52.

Apart from Simpson's testimony that plaintiff lost a
total of 29 runs from December 12, 2001, to April 4, 2002,
plaintiff attempts to show through the testimony of Blevins,
Smyth and Wriston that it lost during the same period some 245
runs per month because Unit 37 was down.  Plaintiff succeeds at
most in showing that it lost 245 runs as a result of first
gaining in August 2002 the Williamson market and then losing it
to Stat in February 2003 as reflected in the lost profits
analysis by plaintiff's expert, Daniel Selby, who projects
damages thereby sustained by plaintiff of $1.6 million.

The 245 lost runs per month from December 2001 to
April 2002 is grounded solely on the testimony of Blevins, Smyth
and Wriston.  Blevins, who was neither an employee or owner of
either Stat or Community Response, testified that he believed
Community Response took 245 runs per month from plaintiff during
the period of December 2001 and April 4, 2002.  Dep. Blevins at
p. 37.  Blevins' testimony in this regard is without any

foundation and is disregarded as being pure speculation on his part.

Smyth, after testifying about Stat's expansion into the Williamson market, stated that "[w]e took the employees, and that's what messed it up." Dep. Smyth (01/07/04) at p. 27. His examination by plaintiff's counsel then proceeded:

> Q.  Since December of 2001, based on Stat's goals and efforts to occupy not only Gilbert, but the entire county, would you agree that Stafford has at least lost 245 ambulance trips or runs per month?
> A.  I run 480 to 500.  So that's 480 to 500 calls a month that would have been his.
> Q.  Okay.  Let me see.  Community Response Ambulance Service has always been an ambulance before your title as director of Stat that you were working for?
> A.  Yes.
> Q.  Okay.  So what about the runs that Community Response made in the year 2002, from January through the end of the year?
> A.  (Pauses.)
> Q.  Didn't Community Response have a presence in Mingo County at that point and time?
> A.  The calls that Community Response ran were Wyoming County.  You've got something I don't even got. Community Response operated in Wyoming County, and Stat operated in Mingo County.
> Q.  Okay.
> A.  And June 1st is whenever they combined.  So whenever they combined, it just kind of -- the furthest that Community Response came down this way was Bonnie Lester.  I think that's her name.
> Q.  In Wyoming County? Lizard Creek --
> A.  Yes.
> Q.  -- Recreational Area?
> A.  Yes.
> Q.  Okay.  That's in Wyoming County.

13

A.  Yes.  I used to do some stuff for her.  But Stat
basically just took over these figures.  And they
still do this in Wyoming County, on top of the figures
I'm giving you for the other side.
Q.  Okay.  Would you say that the efforts of Stat from
the Fall of 2001, when it first learned that Stafford
was down an ambulance, until it put a truck on the
road, actually did a run in June of 2002, that six-
month or so period of effort by Stat to be seen, to
gain a presence here, would you say that cost Stafford
any runs during that time period?
A.  Before June?
Q.  Yes.  From December of 2001 until June or at least
through April, would you say that cost them some runs?
A.  Before June 1st, they couldn't turn the first
wheel, Stat couldn't until June 1st.
Q.  Because of?
A.  Because of licensing.
Q.  Right.
A.  Everything had to be in place, and they had to do
their inspections.  Everything was in place to start
by November or December.  Everything was in place, but
it took six months to get all of the licenses
straightened out.  So they were kind of building the
business before that.  So people knew that it was
coming.  And we did work real close together, so you
knew something was up towards the upper end.  And
Shane would give them the number saying you can call
this for now.  So Community would come in on the lower
end.  But to actually put a truck down here, no,
Community didn't do that.
Q.  Okay. But whether or not Stat actually did
anything, Mr. Wriston might know?
A. Yes.
Q. Okay.  So you can't say that you have any direct
knowledge about that?
A.  Of that, no.

Id. at 27-30.  After acknowledging that the calls that his

company, Community Response, ran were in Wyoming County and that

Stat operated in Mingo County and after being unable to say that

14

plaintiff's loss of an ambulance cost it any runs from the Fall
of 2001 to June 2002, he was asked again by plaintiff's counsel:

> Q.  Okay.  And I may have asked you this.  But based
> on your knowledge of the history from the time
> Stafford lost Unit 37 up to present, and everything
> that's happened with regard to Stat's involvement in
> this county, its movement into this county and
> everything that occurred during that time period, is
> it plausible that Stafford lost 245 ambulance trips
> per month from December of 2001 up to April 4, 2002?
> A.  Probably could have.

Id. at 34.  Particularly in light of Smyth's prior responses,

his last answer stated nothing more than a plausible possibility

and is insufficient to form the basis of a claim for lost runs

of 245 per month from December 2001 to April 4, 2002.

Shane Wriston, who was the director of Stat from

November 2001 until he left the company in March 2003,

testified:

> Q.  Okay.  From November of 2001 until June 2002, when
> you were actually licensed and actually took a run as
> a Stat Company --
> A.  Correct.
> Q.  -- was Community Response actively taking calls
> and doing runs down here?
> A.  Correct.  We had set up these numbers in this
> building right here next door to us, as a matter of
> fact.  And when people would call us, we had a
> dispatcher that was here that would just transfer the
> call to Pineville to the Community Response office.
> Q.  So, Community Response was actually taking runs
> out of this area?

    A.  Yes.  Maybe not in downtown Gilbert, but in
    Hanover and Justice and just different places.

Dep. Wriston at pp. 7-8.  Wriston's testimony otherwise focuses

on business lost by plaintiff as a result of plaintiff's loss of

the Williamson market.  Wriston provides no support for a claim

of 245 lost runs per month from December 2001 to April 4, 2002.

        Consequently, the only admissible evidence offered by

plaintiff with respect to ambulance runs lost by it from

December 2001 to April 4, 2002, is Simpson's own testimony that

29 runs were lost during that period.  When Simpson was asked by

defendant's counsel whether he could think of any other damages

that plaintiff was claiming as a result of the accident, Simpson

confined his reply to the 29 lost runs.  Dep. Simpson (1/3/03)

at p. 50.

        Moreover, during the deposition of Daniel Selby,

plaintiff's expert on damages, defendant's counsel queried Selby

on the calculation of the 245 lost runs:

    Q.  You've reviewed data pertaining to Stats' runs?
    A.  Yes.
    Q.  Was there ever a month that they had 245 runs?
    A.  Yes.  I believe that they had - it was in 2003, I
    believe that they reached significant numbers higher
    than 245.
    Q.  And that's Stats; correct?
    A.  Correct.

16

```
* * *
Q.  Okay.  If I understand what you're telling me
correctly you're not asserting, or what perhaps more
appropriately is I understand Mr. Simpson to be
asserting that Stats took away 245 trips per month
from Stafford, but rather the 245 represents the
percentage that Stafford believes it can prove it
would have gotten out of the entire expanded -
A.  I understand your question.  Let me struggle
through an answer for you.  It's my understanding that
the genesis of the 245 was the result of him deciding
in his own mind what kind of total population of runs
there are.  From that he extrapolates down to a
percentage of that which he believes he would have
gotten if Stats had not entered.
Q.  Right.
A.  Now, the 245 is a fallout number.
Q.  Right.  In other words, we're not going to look at
the information for Stats and see 245 trips per month.
A.  No, you won't, because that goes back to the
clarification we had earlier that that's merely the
number Mr. Simpson has indicated he would have had if
they hadn't been around.  That's not the whole
population.  Other people or other things might have
detracted from - market reasons might have kept him
from getting it.
```

Dep. Selby at pp. 24 & 61-62.  Selby repeatedly stated that the

245 lost runs were based on what Simpson had told him.  Id. at

12-16.  In view of Simpson's deposition responses, the 245 lost

runs must have related to a period after April 4, 2002.  Selby's

expert testimony is thus based on runs that Stat took from the

plaintiff.  Because Stat was not even licensed to do business

until June 2002, it is apparent that the 245 lost runs to which

Selby refers is that which occurred after Stat made its first

17

run in June 2002.  Two months earlier, on April 4, 2002, the

plaintiff had Unit 37 up and running.

        Furthermore, upon inquiry from plaintiff's counsel,

Selby testified that the 245 number was less than half of the

total volume of Stat's trips.  Id. at p. 67.  Selby also

testified that:

> Q.  You bring up a good point.  I mean, the historical
> data that I've seen, Stafford has more runs per year
> each year since 1998; correct?
> A.  Yeah.  Primarily because a whole new area has
> opened up from which to draw from.  Now, the point,
> though, as in most lost profit cases, is that you're
> not getting as much as you would have gotten in the
> absence of some cause of action.

Id. at p. 51.  Inasmuch as Selby testified that Stat achieved

run numbers in excess of 245 in 2003, being after Stat's entry

into the Williamson market, and inasmuch further as Selby

testified that plaintiff experienced an increase in volume of

runs despite Stat's appearance in the marketplace, plaintiff's

expert effectively limits the loss of 245 runs per month to that

stemming from plaintiff's loss of the Williamson market which

plaintiff did not enter until Critical Link failed in August

2002.

B.  **Plaintiff's Valuation Expert.**

As noted, plaintiff retained Daniel Selby of Selby,
Epperly & Associates as a valuation expert.  Utilizing 245 as
the number of lost runs per month and plaintiff's historical
data on trip revenue and trip costs for 2001, 2002 and 2003,
Selby determined that in 2001 a run would result in a pre-tax
net profit to the plaintiff of $210.84,[4] in 2002 a run would
result in a pre-tax net profit of $126.33 and in 2003 the pre-
tax net profit would be $131.67 per run.  Selby calculated that
as of August 31, 2003, plaintiff had "lost historical profits of
$680,590, pre-tax, or $408,335, net of tax."  Selby 08/25/03
Report at p. 1.

In addition to the historical lost profits, Selby
determined "lost business segment" or the fair market value of
245 trips per month on a permanent basis into the future.
Utilizing the "capitalization of earnings method," Selby
calculated the fair market value of plaintiff's future lost

---

[4]The 2002 and 2003 figures were derived from an annual
average.  The 2001 figures relied solely on the realized data of
December 2001.

profits at $1,005,480.  Selby defined the capitalization of
earnings method as follows:

> Capitalization of earnings requires estimates of: (1)
> ongoing earning power and (2) a capitalization rate
> (or multiple).  The capitalization rate is the
> required rate of return minus the growth rate.  The
> capitalization multiple is the reciprocal of the
> capitalization rate.  "Capitalization" of earnings
> effectively determines the present value of the
> Company's ongoing earning or cash flow power, growing
> perpetually at a fixed rate and discounted at the
> required rate of return.

Id. at p. 3.  Relying on data provided by plaintiff, Selby
calculated an annual after-tax income stream of $232,266.[5]  He
multiplied this stream by the reciprocal of the capitalization
rate determined to be 23.1%.  Id.  To calculate the
capitalization rate, Selby employed the "build up method" which
"requires summation of the components of the required rate of
return on investment, adjusted by subtraction of the expected
long-term growth rate."  Id.  The components he utilized to
determine the capitalization rate included the then current
risk-free rate reflecting a yield to maturity on long-term U.S.
Treasury Bonds of 5.43%, a common stock equity premium of 7%, a
small capitalization equity risk premium of 5.67% and a specific

---

[5]In deriving this figure Selby noted a pre-tax value of
$387,110 and applied an estimated effective tax rate of 40%.

practice/industry risk premium of 5%.  Id.  This last category
was added "to reflect the relative risks associated with an
investment in this entity, given key man and risk premium."  Id.


III.


**Motion for Partial Summary Judgment.**


In its motion for partial summary judgment, the
defendant seeks to show that plaintiff is not entitled to either
lost historical profits or lost future profits.  In support of
the motion, the defendant contends that the plaintiff's claim
for lost profits should not be allowed inasmuch as (1) the
plaintiff entered into a non-compete agreement with Stat
eliminating plaintiff from competing for the very profits it
seeks to recoup in this action, (2) the measure of damages
should be the reasonable rental value of an ambulance, (3) Stat
planned to compete with plaintiff in Mingo County prior to the
accident, (4) plaintiff's own action in handling its employees
substantially contributed to plaintiff's loss of the Williamson
market business and (5) plaintiff's claim does not account for
the possible entry of other competitors into the Gilbert or

Williamson markets.  Defendant asserts that plaintiff has not shown lost profits to a reasonable degree of certainty, has failed to mitigate its damages and has not shown that such lost profits were reasonably forseeable and, therefore, proximately related to the injury sustained in the collision.

Plaintiff responds contending that it has provided the factual predicate for showing an entitlement to both historical lost profits and future lost profits.  This predicate, based on the testimony of Stat affiliated personnel, establishes that Stat would not have entered into the Gilbert market initially and the Williamson market subsequently but for the collision. Plaintiff's failure to continue with a rental vehicle notwithstanding defendant's refusal to pay rental charges is said by plaintiff to be of no moment inasmuch as it did not make sound business sense to continue renting.  Plaintiff adds that the fact it incurred labor problems was the very by-product of Stat's intrusion.  Plaintiff also contends that the non-compete agreement was entered into solely to mitigate plaintiff's losses in the Williamson market while solidifying its interests in the Gilbert market.  May 3, 2004, Aff. Simpson ("[t]he Agreement was a means for Stafford to cut its losses and protect its business

interests in the eastern portion of Mingo County in light of the fact that Stat had grown so financially strong in the western portion that Stafford was losing money in attempting to "keep up" with Stat.").

Subsequent to the close of briefing, plaintiff filed a supplemental brief attaching the affidavit of Simpson.  Simpson 10/21/04 Aff.  In that affidavit, Simpson states that the difference between an ALS and a BLS is the medical equipment on board.  He notes that plaintiff's MRL heart monitor in Unit 37 was rendered unusable and that the monitor costs $10,000 to $12,000 to replace.  He contends that he knows "of no place where a heart monitor can be rented or leased."  Id. Additionally, he asserts that the plaintiff "agreed to allow J.B. Hunt to rent the BLS ambulance until a date certain when the ALS ambulance could be repaired."  Id.  Simpson further states, as to the return of the replacement vehicle, that "[w]hile the BLS ambulance could be used somewhat for convalescent calls, the BLS ambulance did not replace the ALS ambulance for emergency situations; therefore, Stafford felt it was proper to return the BLS' rental unit because it did not replace the ALS unit that was down."  Id.

23

IV.


A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); <u>Id.</u> at 322-23.  A party

24

is entitled to summary judgment if the record as a whole could
not lead a rational trier of fact to find in favor of the non-
moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.
1991).

     Conversely, summary judgment is not appropriate if the
evidence is sufficient for a reasonable fact-finder to return a
verdict in favor of the non-moving party.  Anderson, 477 U.S. at
248.  Even if there is no dispute as to the evidentiary facts,
summary judgment is also not appropriate where the ultimate
factual conclusions to be drawn are in dispute.  Overstreet
v.Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir.
1991).

     In reviewing the evidence, a court must neither
resolve disputed facts or weigh the evidence, Russell v.
Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make
determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179,
182 (4th Cir. 1986).  Rather, the party opposing the motion is
entitled to have his or her version of the facts accepted as
true and, moreover, to have all internal conflicts resolved in
his or her favor.  Charbonnages de France v. Smith, 597 F.2d
406, 414 (4th Cir. 1979).  Inferences that are "drawn from the

underlying facts ... must be viewed in the light most favorable

to the party opposing the motion."  <u>United States v. Diebold,</u>

<u>Inc.</u>, 369 U.S. 654, 655 (1962).

III.

"[A] fundamental principle is that negligence to be

actionable must be the proximate cause of the injury complained

of and must be such as might have been reasonably expected to

produce an injury."  Syl. Pt. 2, <u>McCoy v. Cohen</u>, 140 S.E.2d 427

(W. Va. 1965); <u>see also</u> Syl. Pt. 3, <u>Sergent v. City of</u>

<u>Charleston</u>, 549 S.E.2d 311 (W. Va. 2001) (quoting <u>McCoy</u>).  A

defendant may not be held liable for damages which were not

expected and could not have been anticipated by an ordinary

prudent person.  <u>Aikens v. Debow</u>, 542 S.E.2d 576, Syl. Pt. 2 (W.

Va. 2001).

In <u>Jarrett v. E.L. Harper & Son, Inc.</u>, 235 S.E.2d 362,

Syl. Pt. 2 (W. Va. 1977), the West Virginia Supreme Court of

Appeals held, in relevant part, that the measure of damages in a

tort action for injury to realty is the cost of repair, plus

expenses from the injury, including loss of use during the

repair.  <u>Id.</u>  The supreme court further stated that "loss of use

26

is measured by lost profits or lost rental value." Id. at 405.
Subsequently, this measure of damages was extended to tort
actions involving personal property.  Checker Leasing, Inc. v.
Sorbello, 382 S.E.2d 36, Syl. Pt. 1 (W. Va. 1989).

        "In order to recover for loss of profits as the result
of a tort, they must be such as would be expected to follow
naturally the wrongful act, and are certain both in their nature
and the cause from which they proceed." Ohio-West Virginia Co.
v. Chesapeake & O. Ry. Co., 124 S.E. 587, Syl. Pt. 2 (W. Va.
1924).  A plaintiff must show lost profits with reasonable
certainty and such losses must not be based on mere speculation
and conjecture.  Cell, Inc. v. Ranson Investors, 427 S.E.2d 447,
Syl. Pt. 1 (W. Va. 1992).

        "'As a general rule a person whose property is
endangered or injured must use reasonable care to mitigate
damages; but such person is only required to protect himself
from injurious consequence of the wrongful act by the exercise
of ordinary effort and care and moderate expenses.'" Hardman
Trucking, Inc. v. Poling Trucking Co., Inc., 346 S.E.2d 551, 555
(W. Va. 1986) (per curiam) (quoting Oresta v. Romano Bros.,
Inc., 73 S.E.2d 622, 632 (1952).  Hardman involved a suit by a

27

owner and operator of a Ford triaxle dump truck that was struck
by a triaxle dump truck owned and operated by the defendants.
Hardman, 346 S.E.2d at 553.  Hardman sought "recovery of damages
for injury to its vehicle, lost profits while the truck was
undergoing repairs, loss of the stone being hauled, towing
services, annoyance and inconvenience."  Id.  The supreme court
noted that:

> In a case where the possibility was raised that a
> vehicle owner might lessen his damages by renting a
> replacement, we said that "the plaintiff would not be
> entitled to recover the vehicle's earnings, but only
> the amount it would have cost him to replace the
> vehicle, not including those of its driver, would have
> been relevant on the question of damages."

Id. at 555 (quoting Somerville v. Dellosa, 56 S.E.2d 756, 763
(W. Va. 1949)).  Finding that the plaintiff had presented
evidence showing that renting a replacement vehicle was an
impossibility, the supreme court found that the jury could
consider lost profits.  Id. at 555-56.

     Construing the facts in a light most favorable to the
plaintiff, a collision for which the defendant was responsible
occurred on September 24, 2001.[6]  Within a week a rental was

_____

     [6]The court has previously held that the issue of liability
which is being contested by the defendant should be determined
by a jury.  Inasmuch as this motion seeks a determination of the

obtained with the consent of the defendant.  Subsequently, the defendant withdrew its authorization for the rental and the plaintiff made arrangements to repair its vehicle.  By April 4, 2002, its vehicle was operational.

There is no evidence in the record that the cost to repair Unit 37 exceeded its market value.  Thus, under West Virginia law, plaintiff is entitled to the costs of repair plus expenses from the injury, including loss of use of the vehicle during the repair.  Checker Leasing, 382 S.E.2d at Syl. Pt. 1. In a commercial context, the appropriate measure of damages for the loss of a vehicle is the cost of a rental vehicle, unless no such vehicle is available.  Hardman, 346 S.E.2d at 553. Plaintiff apparently made do with a rental unit until December 2001, incurring $13,800 of rental expenses which are recoverable under West Virginia law.

Simpson testified that the MRL heart monitor and the pulse oximeter on Unit 37 were damaged beyond repair.  Plaintiff is entitled to the monetary equivalent of that equipment's lost value plus expenses including loss of use.  As part of loss of

_____

types of damages plaintiff may legally receive if liability is proven, the court presumes defendant's liability.

29

use, plaintiff seeks lost profits for the period between
December 2001 and April 4, 2002.  In support of this claim,
Simpson has executed an affidavit indicating that he knows of no
place to rent a MRL heart monitor which costs $10,000 to
$12,000.  Although Simpson did testify that the vehicle rented
was an ALS, no mention is made of the status of the medical
equipment on board.  Simpson having testified that during that
period plaintiff refused 29 calls, the plaintiff is entitled to
seek the profits lost from those 29 calls.

Plaintiff further contends that the defendant should
be liable for additional indirect economic damages suffered by
its business as a whole because of the intrusion of a
competitor, Stat, into the Gilbert and Williamson markets.
Plaintiff seeks historical and future lost profits in excess of
$1,600,000 which it contends would not have been incurred but
for the collision.  Liability for damages, however, is not
limitless and not all injuries arguably traceable to a negligent
act are susceptible to legal redress.  There comes a point where
the law recognizes that the purported injury is too remote to
the negligent act to be compensable.

The lion's share of plaintiff's indirect economic damages concerns plaintiff's inability to capture or legitimately compete in the Williamson market.  Selby 08/25/03 Rep. at p. *6.  The undisputed evidence indicates that a large portion of plaintiff's inability to compete was occasioned by its own business decisions and, in particular, a decision to fire an employee in February 2003.  Regardless of the cause, the plaintiff's failure in the Williamson market was not predicated upon the loss of Unit 37 which had been restored to the plaintiff's fleet well prior to the opportunity in the Williamson market arising.  At the time that the Williamson market opened, plaintiff was in the same operational position it would have been absent the collision.  The court finds that even if plaintiff were entitled to indirect economic damages, plaintiff's damages based upon its failures in the Williamson market are too remote as a matter of law from the injury to be proximately related.

To the extent that plaintiff seeks indirect economic damages from December 2001 to April 4, 2002, attributable to Stat's or its affiliate Community Response's intrusion, the evidentiary basis proffered by the plaintiff through the

31

testimony of Blevins, Symth and Wriston is far too speculative and imprecise to support such a claim.  See supra at pp. 11-15.

## VI.

For the reasons set herein, it is accordingly ORDERED that defendant's motion for partial summary judgment be, and it hereby is, granted except to the extent of 29 lost runs from December 12, 2001, to April 4, 2002.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: March 31, 2006

_____
John T. Copenhaver, Jr.
United States District Judge