UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


STAFFORD EMS, INC.,

          Plaintiff

v.                                    Civil Action No.: 2:02-0886


J.B. HUNT TRANSPORT, INC.,
a Georgia corporation,

          Defendant


MEMORANDUM OPINION AND ORDER


          Pending before the court is plaintiff's motion, filed
April 10, 2006, seeking to set aside the court's prior orders
concerning the issues of lost profits, bad faith, and
certification, and further seeking a new trial.  Also pending is
defendant's motion, filed April 10, 2006, seeking to alter or
amend the judgment or, in the alternative, a new trial.[1]


I.


          This action was tried to a jury on November 16, 2004,
through November 19, 2004.  On November 19, 2004, the jury


_____

          [1] A duplicate of defendant's motion was filed on April 11,
2006.

1

returned a verdict awarding plaintiff the sum of $189,750.56.
The verdict form reads

> What amount, if any, do you award plaintiff for
> property damage to Unit 37 incurred as a proximate
> result of the negligence of the defendant    $13,626.54

> What amount, if any, do you award plaintiff for
> equipment damage incurred as a proximate result of the
> negligence of defendant                       $ 1,132.50

> What amount, if any, do you award plaintiff for rental
> expense incurred as a proximate result of the
> negligence of the defendant                   $13,800.00

> What is the amount for lost profits incurred by
> plaintiff from September 24, 2001, to April 4, 2002,
> if any, as a proximate result of the negligence of the
> defendant                                     $79,104.00

> What amount, if any, do you award plaintiff for excess
> overtime incurred as a proximate result of the
> negligence of defendant                       $ 2,087.52

> What amount, if any, do you award plaintiff for
> annoyance and inconvenience as a result of the
> negligence of the defendant                   $80,000.00

On June 30, 2005, the defendant filed a Notice of
Partial Satisfaction of Judgment reflecting that it had paid in
full, including interest, the amounts the jury awarded for

2

property damage, equipment damage, rental expense and excess
overtime; however, the notice indicated that the defendant did not
pay the amounts awarded for lost profits and annoyance and
inconvenience, which total $159,104.00.

On March 31, 2006, the court issued a memorandum opinion
and order addressing defendant's motion for partial summary
judgment, filed on April 7, 2004, which sought as a matter of law
to exclude plaintiff from claiming lost profits as a component of
its claimed damages.[2]  Also on March 31, 2006, the court entered a
judgment order in favor of plaintiff for the sum of $189,750.56.

On April 17, 2006, defendant filed a notice of appeal
representing that it is appealing the final judgment order entered
by this court on March 31, 2006, to the United States Court of
Appeals for the Fourth Circuit.  More specifically, the notice
represents that defendant is appealing the portions of the
judgment pertaining to plaintiff's claim for past lost profits and

_____

[2] On the morning of the first day of trial, November 16,
2004, the court granted defendant's motion on the record except
to the extent plaintiff sought lost profits for 29 runs that were
allegedly lost during the period from December 12, 2001, to April
4, 2002.  (Transcript at 19-20.)(hereinafter "Tr. at ___").  The
rationale for this ruling was contained in the March 31, 2006,
memorandum opinion and order.  As this memorandum opinion and
order makes clear at the outset, the court's ruling was based on
the record as it existed on November 16, 2004.

3

annoyance and inconvenience and the court's rulings with respect
to motions and jury instructions related thereto.

II.

Federal Rule of Civil Procedure 59(a) provides in
pertinent part

> A new trial may be granted to all or any of the parties
> and on all or part of the issues . . . in an action in
> which there has been a trial by jury, for any of the
> reasons for which new trials have heretofore been
> granted in actions at law in the courts of the United
> States.

Subsection (e) of this rule further provides that "[a]ny motion to
alter or amend a judgment shall be filed no later than 10 days
after the entry of the judgment."

The federal and state standards governing verdict
vacatur and a new trial are essentially identical.  Compare Atlas
Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d
587, 594 (4th Cir. 1996), with Neely v. Belk Inc., 222 W. Va. 560,
566, 668 S.E.2d 189, 195 (2008).  The two standards diverge,
however, when relief is sought based upon the excessiveness of the
verdict.

This divergence is important.  Following the decision in
Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433

4

(1996), state law essentially supplies the standard of review for the district court as it assesses the size of the verdict:

> The Supreme Court determined that because the <u>Erie</u> doctrine . . . "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court," a district court sitting in diversity must apply state law standards when it considers a Rule 59(a) motion for a new trial based upon the alleged excessiveness of the jury's compensatory damage award.
>
> <u>Gasperini</u> overruled our circuit precedent that called for district courts sitting in diversity to apply federal law in determining the merits of a motion pursuant to Rule 59(a) for a new trial based upon the alleged excessiveness of the jury's verdict. Specifically, in our circuit prior to <u>Gasperini</u>, a district court was required to set aside a jury's verdict as excessive "even when such a verdict is supported by substantial evidence 'if [it] is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice.'"
>
> Under the Supreme Court's mandate in <u>Gasperini</u>, the magistrate judge was required to apply Pennsylvania law in determining whether the jury's $1,000,000 compensatory damage award in favor of Konkel was excessive.

<u>Konkel v. Bob Evans Farms Inc.</u>, 165 F.3d 275, 280-81 (4th Cir. 1999) (citations omitted).

> The West Virginia standard governing the review of verdicts for excessiveness is now reasonably well settled:
>
> > "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show

jury passion, partiality, prejudice or
corruption." Syl. Pt., <u>Addair v. Majestic
Petroleum Co., Inc.</u>, 160 W.Va. 105, 232 S.E.2d
821 (1977) [hereinafter, "the <u>Addair</u>
standard"].

Syl. pt. 5, <u>Roberts v. Stevens Clinic Hosp., Inc.</u>, 176
W. Va. 492, 345 S.E.2d 791 (1986). We agree with Judge
Hatcher's conclusion that the verdict was not excessive
and, thus, Sopher was not entitled to remittitur or a
new trial on damages.

<u>Coleman v. Sopher</u>, 201 W. Va. 588, 606, 499 S.E.2d 592, 610

(1997); <u>Adkins v. Foster</u>, 187 W. Va. 730, 735, 421 S.E.2d 271, 276

(1992) (quoting <u>Addair v. Majestic Petroleum Co., Inc.</u>, 160 W.Va.

105, 232 S.E.2d 821 (1977)).


        Respecting the Rule 59(e) component of defendant's

request, commentators have observed that in light of "the narrow

purposes for which they are intended, Rule 59(e) motions typically

are denied."  11 Charles A. Wright <u>et al.</u>, <u>Federal Practice and

Procedure</u> § 2810.1 (1995).  The United States Court of Appeals for

the Fourth Circuit has recognized that "Rule 59(e) motions can be

successful in only three situations: '(1) to accommodate an

intervening change in controlling law; (2) to account for new

evidence not available at trial; or (3) to correct a clear error

of law or prevent manifest injustice.'"  <u>Zinkand v. Brown</u>, 478

F.3d 634, 637 (4th Cir. 2007)(citations omitted).

III.

In defendant's pending motion, it takes issue with the jury's awards for lost profits and annoyance and inconvenience. Defendant seeks an order altering or amending the judgment to conform with the evidence admitted at trial or, in the alternative, a new trial as to the issues of plaintiff's past lost profits and annoyance and inconvenience.

A.  <u>Lost Profits</u>

Defendant insists that the only evidence of plaintiff's lost profits damages that was admitted at trial was plaintiff's exhibit 28, which is an outline of damages alleged by plaintiff. On this exhibit, line items six and seven relate to lost profits. Line item six provides

> We compiled our figures based on the last six months and calculated an average of 1.9 runs at a cost of $1,052.99 per day.  We were without a truck for 7 days, making the average lost income $7,370.93.

After the typed font on line six, there it is handwritten "9-24-01 to 10-04-01 No amb."  As for line item 7, it reads

> List of actual lost runs while without an ambulance, after rental turned in and before we bought one Dec 12

7

01 to 4-4-02.[3]  Estimate amount lost $5974.00 (29 runs
@ $206.00 per run).

According to defendant, insofar as the only evidence relating to
lost profits totals $13,344.93 the jury either made a mistake or
miscalculation, misapplied the law, or impermissibly attempted to
award punitive damages or additional damages for future lost
profits.

        Plaintiff responds tersely contending that the jury's
verdict was not clearly excessive, nor did the jury have a
mistaken view of the case.  Plaintiff then observes that the jury
may have calculated past lost profits as follows: 192 (days
plaintiff was without Unit 37) x $206 (the net per-run profit)=
$32,552[4] x 2 (runs per day, on average, that Unit 37 could have
completed had it been in service) = $79,104.00.  In its reply,
defendant insists that the evidence supports an award for lost
profits only in the amount of $13,344.93, but offers an
alternative calculation of plaintiff's lost profits in the event
the court is not persuaded by this figure.  Defendant asserts
that plaintiff's suggestion as to how the jury arrived at $79,104
is erroneous inasmuch as the evidence at trial established that
(1) plaintiff rented an ambulance for 73 of the 192 days it was

---

[3] The words appearing after the comma in this sentence are
handwritten.

[4] The figure that plaintiff presumably intended to place in
its calculation is $39,552.

**8**

without Unit 37, and (2) plaintiff lost only 1.9 runs per day,
not 2.  Accordingly, defendant's alternative calculation of
plaintiff's lost profits is as follows: 119 (days Stafford was
without Unit 37 or a rental) x $206.00 (the net per-run profit) =
$24,514.00 x 1.9 (runs on average Unit 37 could have completed) =
$46,576.60.

        The court first observes that defendant's argument with
respect to lost profits would have been more appropriately
asserted in a motion for judgment as a matter of law with respect
to damages.  More specifically, defendant is asserting that the
evidence submitted by plaintiff only supports a lost profits
verdict for $13,344.93 or $46,576.60.  Despite conceding
liability, defendant did not make such a motion seeking a ruling
from the court that plaintiff's lost profits damages could be
determined as a matter of law, nor did it voice any objection to
either the jury instruction or jury interrogatory regarding
plaintiff's damages.  (Tr. at 528-38, 572.)  In any event, as
defendant's alternative lost profit figures would suggest, such a
motion would likely not have been granted as the court recognized
that the evidence could support an award of differing amounts for
lost profits. (Tr. at 536-37.)

        Furthermore, although defendant contends the jury was
confused as to the amount of plaintiff's lost profits, it offered

                                9

no testimony to illuminate this issue.  The entirety of defendant's case consisted of only one witness, a layperson, whose testimony lasted approximately 50 minutes and primarily addressed the amount of plaintiff's property damage.  Defendant elicited no testimony with respect to plaintiff's lost profit damages from this witness.[5]  (Tr. at 493-526.)

It is well accepted that Rule 59(e) is not a vehicle through which a party may assert arguments that could have been raised prior to the entry of judgment.  Wright et al., supra § 2810.1.  Defendant could have raised the arguments regarding lost profits it now asserts in its post-trial motion (1) to the jury in the form of testimony on this point or (2) to the court in the form of a motion for judgment as a matter of law or an objection

---

[5]Defendant perhaps chose to forego the formulation of a competing estimate for lost profits damages out of a concern that the fact finder would take the alternative calculation as an implicit admission that the damage element had merit generally. The United States Court of Appeals for the Seventh Circuit addressed a similar situation, along with the attached consequences:

> American Bakeries may have feared that if it put in its own estimate of damages the jury would be irresistibly attracted to that figure as a compromise. But if so, American Bakeries gambled double or nothing, as it were; and we will not relieve it of the consequences of its risky strategy.

Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1342 (7th Cir. 1988).

to the pertinent jury instruction and/or interrogatory.[6]

Defendant cannot relitigate this issue simply because the jury

returned a verdict with which it disagrees.

_____

[6]Under a former version of Rule 51 that existed prior to a
substantial amendment in 2003, our court of appeals observed as
follows:

>     Rule 51 of the Federal Rules of Civil Procedure
>     provides: "No party may assign as error the giving or
>     the failure to give an instruction unless that party
>     objects thereto before the jury retires to consider its
>     verdict. . . . "  Fed. R. Civ. Proc. 51 (2003)(amended
>     2003).  <u>By agreeing to an instruction which
>     specifically authorized the verdict returned by the
>     jury, GATX waived its right to argue on appeal that the
>     jury was required to award a greater amount</u>.

<u>First Union Commercial Corp. v. GATX Capital Corp.</u>, 411 F.3d 551,
556-57 (4th Cir. 2005) (citations omitted) (emphasis supplied).
The aforementioned waiver principles remain intact following the
2003 amendment.  <u>See</u> 9C Charles A. Wright <u>et al.</u>, <u>Federal
Practice and Procedure</u> § 2551 (3rd ed. 2008); <u>see also id.</u> § 2553
("As many courts have held, objections under Rule 51(c) to the
instructions made after the jury retires and has begun
deliberating are not timely and will not be considered on appeal
or on a motion for a new trial.   . . . It certainly is too late
to object to a charge after a verdict has been returned.").
         The same principles apply respecting a failure to
seasonably raise other arguments prior to submission of the case
to the jury. <u>See</u> <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>,
546 U.S. 394[, 398 n.1] (2006) (stating "'A post-trial motion for
judgment can be granted only on grounds advanced in the
pre-verdict motion.'" (quoting Comm. Note on Amendments to
Federal Rules of Civil Procedure, 134 F.R.D. 525, 687 (1991));
<u>DeCorte v. Jordan</u>, 497 F.3d 433, 438 (5th Cir. 2007) (stating "We
caution that Rule 50(a) motions should be . . . specific, as
required by Rule 50(a)(2)."); <u>Tuttle v. Metropolitan Government
of Nashville</u>, 474 F.3d 307, 316 (6th Cir. 2007)("A post-verdict
judgment as a matter of law 'is not available at anyone's request
on an issue not brought before the court prior to submission of
the case to the jury.'").

Finally, West Virginia law does not require that plaintiff prove its damages to "the exactitude of a mathematical calculation," but only that they be shown "to a reasonable certainty or a reasonable probability."  Belcher v. King, 123 S.E. 398, 402 (W. Va. 1924); see also Olympia Equipment Leasing Co. v. Western Union Telegraph Co., 797 F.2d 370, 383 (7th Cir. 1986) ("Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.").  Defendant effectively seeks a precise mathematical calculation; however, as defendant's alternative damages figures suggest and the court has observed, evidence exists in the record to support differing amounts of lost profits damages.  The court thus declines defendant's invitation to substitute its judgment for that of a jury on this issue.

B.  Annoyance and Inconvenience

The court's jury instructions on annoyance and inconvenience provide in relevant part

> In connection with damage to property, a plaintiff may recover for any annoyance and inconvenience it has suffered, provided the damages are a limited amount, measured by an objective standard of ordinary persons acting reasonably under the circumstances.  Thus, if you find from the evidence that plaintiff suffered any annoyance and

inconvenience in connection with its loss of use of
Unit 37, then you may award the plaintiff that amount
of damages you feel sufficient to fairly compensate
the plaintiff for its loss, but not for lost profits
or any other loss for which plaintiff has been
compensated by your verdict otherwise . . .

[I]n this case, the plaintiff seeks damages for
annoyance and inconvenience relative to scheduling
difficulties and problems it suffered as a result of
having Unit 37 out of service for the period of time
indicated by the evidence, including having to
retrieve patients late and by being forced to leave
some patients unattended at hospitals and physicians'
offices for their appointments, whereas normally the
plaintiff's attendants stayed with the patient and
were immediately available to transport the patient
back home.  Of course, you may not award any damages
to Kendell Simpson for any annoyance and inconvenience
that he may have personally suffered as he is not a
party to this lawsuit.

(Tr. at 575-76.)

Defendant first observes that the award for annoyance
and inconvenience is closely related to the amount awarded by the
jury for lost profits.  It further asserts the jury's erroneous
award for lost profits formed the basis of its award for annoyance
and inconvenience, and if the court does not amend the jury's
award for annoyance and inconvenience, a manifest injustice will
result.  The court rejects defendant's position on this point as
one based on unfounded speculation.

Next, defendant asserts that plaintiff may not recover
annoyance and inconvenience damages under West Virginia law.

13

The question of whether a corporation may recover for annoyance
and inconvenience has been presented to the West Virginia Supreme
Court on an occasion when the court declined to resolve it.
Hardman Trucking, Inc. v. Poling Trucking Co., Inc., 346 S.E.2d
551, 556 (W. Va. 1986) (per curiam) ("The arguments of both
appellant and appellee are directed at the legal question of
whether a corporation can recover such [annoyance and
inconvenience] damages.  We need not reach this issue . . .").
However, as the court's jury instructions recognize, the West
Virginia Supreme Court has observed that annoyance and
inconvenience claims arising from property use loss represent
damages that: 1) are "closely tied to the property damage loss";
2) constitute "a limited amount measured by an objective
standard"; and 3) "will [generally] account for only a minor
portion of the total damages recovered by a successful plaintiff."
Beard v. Lim, 408 S.E.2d 772, 776 (W. Va. 1991) (quoting Kirk v.
Pineville Mobile Homes, Inc., 310 S.E.2d 210, 212-13 (W. Va.
1983).

It is undisputed that West Virginia law permits a person
to recover damages for annoyance and inconvenience.  Furthermore,
it is a well established principle that corporations are treated
as artificial persons.  Queen v. West Virginia University

14

Hospitals, Inc., 365 S.E.2d 375, 380 (W. Va. 1987) (citation omitted); see also Am Jur Corporations § 1 ("corporation is . . . an artificial person, that is, a legal fiction or a creature of statute."). Inasmuch as a person can bring an action for annoyance and inconvenience, and the law treats a corporation as an artificial person, it follows that a corporation may similarly recover for the annoyance and inconvenience it has suffered.[7]

---

[7]While the decision in Hardman did not mention it, an earlier case arguably resolved the issue contrary to the defendant's position. In the landmark decision of Hayseeds, Inc. v. State Farm Fire & Casualty, 177 W. Va. 323, 352 S.E.2d 73 (1986), the lone plaintiff in the case style appears to have been a corporate entity. The supreme court of appeals' observations are noteworthy:

> Accordingly, we hold today that when a policyholder substantially prevails in a property damage suit against an insurer, the policyholder is entitled to damages for net economic loss caused by the delay in settlement, as well as an award for aggravation and inconvenience.

> However, in allowing an award for aggravation and inconvenience, we do not intend that punitive damages be awarded under another sobriquet. For example, a large corporation with an in-place, organized collective intelligence that must litigate a claim for several years may suffer substantial net economic loss but little aggravation and inconvenience. On the other hand, a family of five that is required to live for four years in a trailer because an insurance company has declined to pay the fire policy on their $200,000 house suffers little net economic loss but an enormous degree of aggravation and inconvenience.

Id. at 330, 352 S.E.2d at 80 (emphasis supplied).

15

Defendant further observes that the evidence of plaintiff being late for certain runs as a result of Unit 37 being out of service formed the basis of the jury's annoyance and inconvenience award.  Defendant maintains that under the evidence of this case it was the patients, not the plaintiff corporation, that were annoyed or inconvenienced.  The court observes that at the instruction stage, it concluded that evidence of plaintiff's tardiness for certain runs could form the basis for an award of annoyance and inconvenience damages and it sees no reason to depart from this conclusion.

Finally, defendant notes that plaintiff received first party insurance benefits related to its property damage claim; however, evidence of these benefits would have been prohibited at trial under Federal Rule of Evidence 411.  According to defendant, plaintiff failed to use the insurance proceeds in a timely manner to repair or replace Unit 37 and, had the evidence of first party insurance benefits been admissible, the jury could have concluded that plaintiff was the party responsible for the alleged annoyance and inconvenience.

The court simply notes that defendant does not object to the court's ruling that first-party insurance benefits received by the plaintiff were properly excluded.  (Tr. at 6.)  Defendant even

16

concedes that the evidence of these insurance benefits was inadmissible under Federal Rule of Evidence 411.  Inasmuch as the evidence was properly excluded, the court need not speculate as to the conclusions a jury may have reached had this evidence been admissible.

IV.

Although plaintiff's motion is styled "motion to set aside prior orders on the issues of lost profits, bad faith, and certification; and for new trial," both the accompanying memorandum in support of the motion and plaintiff's reply to defendant's response to the motion address only the issue of lost profits.  Additionally, plaintiff's memorandum and reply only request that the court's March 31, 2006, order ruling upon defendant's motion for partial summary judgment, which did not address the issues of certification and bad faith, be set aside and a new trial granted on the issues of damages claimed for lost profits suffered as a result of the crash.  Inasmuch as plaintiff has presented no arguments in support of its position that it is proper to set aside the court's prior rulings on bad faith and certification and inasmuch further as it appears that plaintiff is not seeking relief from these rulings, the court will not further

address its previous rulings on the bad faith and certification issues.

Eleven of the twenty pages contained in plaintiff's memorandum in support of its pending motion are substantively identical to the memorandum it filed in response to defendant's motion for partial summary judgement.  The court has thus already considered and rejected the majority of the arguments reasserted by plaintiff in its motion.

The only argument not previously addressed by the court is plaintiff's contention that the court improperly recited, failed to consider, and/or misconstrued pertinent deposition testimony in its March 31, 2006, memorandum opinion and order, which led to the court's allegedly erroneous conclusions that plaintiff could not impose liability for indirect economic damages allegedly occasioned by the intrusion of a competing ambulance service, Stat, or its affiliate ambulance service, Community Response, into the Mingo County market.

Plaintiff's argument reflects its unwillingness to accept the court's conclusion that (1) plaintiff's purported indirect economic damages in the Williamson market are too remote from the September 2001 accident to be recovered and (2) the

testimony proffered by plaintiff with respect to its alleged indirect economic damages claim from December 2001 to April 4, 2002, is far too speculative.  (Memo. Op. and Ord. at 31-32.) Plaintiff has provided no new legal authority for its argument that it may recover such speculative lost profits damages. Indeed, in its nine page discussion it cites only one case, which was previously cited in the court's March 31, 2006, memorandum opinion and order, for a general proposition.  Instead, plaintiff focuses its attention on the record, which it contends permits the recovery of alleged indirect economic damages.

Plaintiff first suggests that the court failed to properly acknowledge evidence showing that its competitors contemplated entering the Mingo County market only because of the September, 2001, accident that damaged Unit 37.  This suggestion is simply not correct.  The court stated in its March 31, 2006, memorandum opinion and order that "Blevins, Smyth and Wriston all stated [in their depositions] that the loss of Unit 37 was the catalyst for Stat entering the Gilbert market."  (Memo. Op. and Ord. at p. 10.)  This testimony, of which the court was well aware, does not compel the conclusion that plaintiff may recover its purported indirect economic damages.

19

Plaintiff next takes issue with the court's recitation that "Smyth contacted Shane Wriston in August 2001 and asked if Wriston was interested in opening an ambulance service in Mingo County for Sims.  Dep. Wriston at p. 5."  (Memo. Op. and Ord. at p. 9.)  According to plaintiff, the court relied on this statement to erroneously conclude that Stat was contemplating entering the Mingo County market prior to the September 2001 accident.

During his deposition, when queried by plaintiff's counsel regarding the origins of Stat, Wriston testified that

> A.   I was contacted back in August of 2001.  Me and the owner of Community Response [Jason Smyth] was trying to get an ambulance in Raleigh County, and he asked me if I was interested in opening an ambulance service.  And of course, I agreed.  Then he told me it was in Mingo County . . .
>
> Q.  Okay.  So in November of 2001, when you came down here, you understood that Stat was focused on starting out here in Gilbert?
>
> A.  Correct.
>
> Q.  Just because they realized that Stafford was crippled?
>
> A.  Correct.

Plaintiff asserts the court erred when it assumed that Wriston's use of the word "then" referred to the August communication between Smyth and Wriston and not "some time later."

20

Plaintiff's strained reading of Wriston's deposition testimony, which is not specifically refuted by Wriston's trial testimony, was not asserted in plaintiff's response to the defendant's motion and was raised for the first time in its post-trial motion.  Nevertheless, even if the court were to adopt plaintiff's interpretation of Wriston's deposition testimony, it does not somehow serve to alter the court's conclusion that the testimony of Blevins, Smyth and Wriston was far too speculative to support the indirect economic damages it sought to recover for the period of December 2001 to April 2002. (Memo. Op. and Ord. at p. 11-16.)  As the court explained throughout its memorandum opinion and order, there were numerous factors that rendered plaintiff's indirect economic damages claim too speculative and remote.

It is also worthy of mention that Wriston's agreement to plaintiff's counsel's characterization of plaintiff as "crippled" in November of 2001, a characterization Wriston would subsequently use when he testified at trial, is somewhat misleading.  In November of 2001, plaintiff had been without a replacement for Unit 37 for approximately a week at the end of September, 2001.  After that week, plaintiff was renting another ambulance and would continue to do so until December of 2001.

21

Plaintiff further insists that the court was "in error" when it observed that "[a]lthough Stat began canvassing the community and maintaining a presence in Gilbert as early as November 1, 2001, Stat was not licensed until June 2002 and did not make any runs until then."   (Memo. Op. and Ord. at p. 10.) Plaintiff then observes that Wriston's trial testimony conclusively establishes that Community Response, a company affiliated with Stat, transported approximately 240 runs per month out of the Gilbert, Mingo County area from the time Stat began renting space in Gilbert in January of 2001 until it began transporting patients in July of 2001.[8]

---

[8] Plaintiff mischaracterizes Wriston's trial testimony, which is fraught with ambiguity.  The pertinent portion of Wriston's trial testimony provides

> Q.  Right.  But do you in fact know of your own personal knowledge that you referred transport BLS type patients from Mingo County from the Gilbert area or Stafford area to Community Response in Wyoming County?
>
> A.  Oh, yes.
>
> Q.  And how frequently, if you can estimate -- if you can't estimate, I don't want you to answer -- but how often did this occur during the time you were set up there in Gilbert?
>
> A.  It varied.  There at the end [referring to the month preceding Stat's receipt of a license on July 1, 2002], I mean, it was -- it was very common practice. Probably at the end, it was probably 240 runs a month that we was transporting.

(continued...)

It suffices to say that Wriston's trial testimony does nothing to support plaintiff's claim for indirect economic damages from December 2001 to April 4, 2002, and accordingly does not alter the court's conclusion that the testimony of Blevins, Smyth and Wriston is too speculative to support a claim for indirect economic damages during this time period.

Also, the court's recitation of the at-issue facts were followed by citations to deposition testimony that, upon another review, supports the recitation.  At trial, Wriston testified that Community Response did take calls from Gilbert, Stat began aggressively advertising in January, was not licensed to make ambulance runs until July 1, 2002, and did not do so until that time, and prior to July 1, 2002, Stat had been referring customer calls to Community Response.  (Tr. at 469-71.)  The court's factual recitation correctly captured Wriston's deposition testimony and it is not responsible for his slightly inconsistent statements at trial.

---

[8](...continued)
(Tr. at 470-71.)  In the remainder of his trial testimony, Wriston did not identify the amount of runs plaintiff allegedly lost from December 2001 to April 4, 2002, as a result of Stat referring calls to Community Response.  Wriston's trial testimony thus only suggests that in the month prior to Stat making its first run in July of 2002, during which month Unit 37 was up and running, Community Response probably transported 240 runs in Stafford's primary area.

23

Plaintiff further observes that the deposition testimony establishes that Stat did not compete fairly or legally when it attempted to secure the employees of another ambulance company.  Again, this observation is not germane to the court's analysis and does nothing to alter the court's conclusions with respect to plaintiff's indirect economic damages claim.

Although plaintiff takes issue with the court's suggestion that plaintiff's loss of 15 to 17 employees to Stat hampered its ability to compete in the Williamson market, it has offered nothing to challenge this conclusion, beyond its observation that Stat was not competing fairly or legally for employees, other than a speculative statement that Stat would not have been competing in the Williamson market absent plaintiff's loss of Unit 37.

Finally, plaintiff maintains the court failed to give proper weight to its expert's testimony regarding lost profits. For the reasons more fully stated on pages 17 to 18 and 30 to 32 of the memorandum opinion and order, the court notes that it properly rejected plaintiff's expert's hopelessly speculative opinion, which lacked a proper factual predicate, that plaintiff incurred $1.6 million dollars in lost profit damages arising out

24

of a vehicle accident in which plaintiff incurred less than $15,000 in property and equipment damage.

The court thus concludes that its legal analysis with respect to indirect economic damages withstands plaintiff's scrutiny and plaintiff's motion should be denied.

V.

In view of the foregoing, it is ORDERED that the motions of both plaintiff and defendant be, and they hereby are, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED:  February 26, 2009

John T. Copenhaver, Jr.
United States District Judge

25